# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00282-CV

---

### E. E., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 299,334-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant E.E. (Mother) appeals from the district court's de novo decree terminating her parental rights to her two children, Daughter and Son.[1]  In a single issue on appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the district court's finding that termination of her parental rights was in the children's best interest.  *See* Tex. Fam. Code § 161.001(b)(2).  For the following reasons, we reverse the decree and remand the case to the district court for a new trial.

## BACKGROUND

On March 27, 2018, the Texas Department of Family and Protective Services filed an original petition in a suit affecting the parent-child relationship, seeking to terminate

---

[1]  We refer to appellant as Mother or by her initials and to the children as Daughter and Son.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  Father was a party in the underlying proceeding but died in February 2019.

parental rights and to be appointed managing conservator. At that time, Daughter was nine, and Mother was in the hospital with her newborn Son. The Department sought removal based on the parents' drug use. In the removal affidavit, the Department's investigator averred that neither parent had a prior history with the Department but that they admitted to drug use; that Mother and Son were currently at the hospital and "had positive urine tests for amphetamines"; that Mother allegedly "admitted that she used methamphetamines two to three days prior to coming in for delivery"; and that Mother "asked if Child Protective Services [could] help her get away from bad stuff and drugs."

The children were placed in separate foster homes, and Mother was ordered to participate in services. Mother was tasked with attending individual counseling; submitting to drug testing on a weekly basis; participating in supervised visits; maintaining contact with the Department; completing psychological and Outreach, Screening, Assessment, and Referral (OSAR) evaluations; maintaining employment; providing and maintaining a safe, clean, and appropriate home; and paying child support. The family service plan states that Mother had "the support of her family," was living with her sister, had her own transportation, and was employed.

Mother tested positive for methamphetamine twice in July 2018, and missed drug tests through July 2018, but she subsequently tested negative on a weekly basis except for a positive hair follicle test in December 2018 and a negative-diluted test in March 2019. Mother cooperated and maintained contact with the Department. She also consistently visited with her children until the Department abated the visits shortly after Father's death in February 2019. Mother also did not comply with her child support obligations, but she participated in services,

including being successfully discharged from individual therapy,[2] completing her OSAR assessment in November 2018 with no recommended treatment, maintaining contact with the Department, and staying employed.

In March and April 2019, the associate judge denied Mother's request for an extension, proceeded to a final hearing, and entered a decree terminating Mother's parental rights. The hearing before the associate judge took place on March 5, April 2, and April 9, 2019, and Mother's brother (Uncle) and sister-in-law (Aunt), who lived in Louisiana, filed a petition in intervention on March 26, 2019, seeking to have the children placed with them. Mother also requested de novo hearings before the district court concerning the associate judge's denial of an extension and termination of her parental rights. Following a de novo hearing on April 16, 2019, the district court entered an order granting an extension, vacating the associate judge's decree of termination, reinstating Mother's family service plan, and ordering the Department to prepare an expedited home study on Uncle. The district court further authorized visitation between Mother and the children "in accordance with the recommendations of the [Daughter's] therapist," but the therapist did not authorize visits between Mother and the children at any subsequent time.

The final hearing occurred over several days: September 27, 2019; December 6, 2019; April 27, 2021; and May 4, 2021. During the September 2019 hearing, the conservatorship caseworker testified that the Department was seeking to terminate Mother's parental rights because of Mother's methamphetamine use "throughout the case." Although the

---

[2] In her monthly report from February 2019 that was filed with the district court, Mother's therapist concluded that Mother was "being successfully discharged from individual therapy" because she had "made progress in therapy," acknowledged the consequences of substance abuse, taken "ownership of her role in CPS intervention," "can identify positive parenting strategies and how to keep her children safe," and has "the skills and necessary insight to continue to work on improving her coping skills."

3

evidence showed that Mother's OSAR assessment in November 2018 did not recommend treatment, the caseworker testified that for the Department to consider Mother, she "really would need to get in some type of inpatient treatment program to get ahold of her drug use." The caseworker, however, agreed that Mother had not tested positive in her weekly drug tests for almost nine months other than a "negative dilute" in March 2019 and the "last positive hair" in December 2018.[3]

The guardian ad litem advised the district court that she "would be perfectly fine" with placing one-year-old Son with Uncle and Aunt because he was "young enough" and "when children bond in one home they can bond in another" but that ten-year-old Daughter wanted to stay in her current placement with her foster mother and described Daughter as a "really delicate child." The guardian ad litem represented that Daughter had been "really clear" that she "want[ed] to stay in the home that she's in," explaining that at one point, the Department tried to place the children together in the same foster home but Daughter "cried the whole weekend because she wanted to be back in the home that she's in now." The foster mother had taken care of Daughter from the case's beginning and completed the necessary steps to adopt Daughter, but she was not interested in adopting Son. The district court adjourned the proceeding so that the Department could obtain the home study on Uncle and Aunt, Daughter continued to live with her foster mother, and Son began living with Uncle and Aunt.

In November 2019, the Department approved the home study concerning Uncle and Aunt, and the final hearing before the district court resumed on December 6, 2019. Uncle appeared for the hearing, provided the court with information about his background, and testified

---

[3] The exhibits included the Department's final report to the court that lists a weekly negative drug test beginning in August 2018, except for the December 2018 positive hair follicle test and the negative diluted in March 2019.

4

that he wanted the children placed with him. By the time of the resumed hearing, the parties agreed to Son's placement with Uncle and Aunt. The Department did not have a position as to Mother's parental rights to Son if he was placed with Uncle and Aunt, but the Department continued seeking termination of Mother's parental rights to Daughter and Daughter's adoption by her foster mother. The caseworker testified that Daughter had "really bonded" with her foster mother and "loved being there."

Concerning the Department's request to terminate Mother's parental rights to Daughter, the caseworker testified it was because of her drug use, although she acknowledged Mother's negative weekly drug tests. She also testified that she could not recommend the children's placement with Mother because Mother had not completed her psychological evaluation or paid child support and was living with family members in a small home that already had several adults and children. Concerning Mother's visits with the children, the caseworker explained that they were abated because Mother told Daughter during a visit shortly after Father's death in February 2019 that he was not dead. The Department had instructed Mother not to discuss his death, a therapist had told Daughter that he had died, and Daughter had "confusion and obvious angst" about Father's death that "lasted for months." Recognizing that Mother was originally from Palau and did not speak English as a first language, the caseworker testified that she could see why the Department's instruction could have been confusing to Mother.

The guardian ad litem opined that Daughter should stay with her foster mother and be adopted in that home, that Daughter wanted to stay there, and that Daughter felt "really safe and stable there." When she explained to Daughter that Son probably would go with Uncle and Aunt, she said Daughter's desire to stay with her foster mother did not change. The guardian

5

explained that Daughter did not remember Uncle and Aunt and that visits had not happened with them by that point in the case. When asked if Daughter understood that she would not be with Son forever if she stayed with her foster mother, the guardian answered, "Yeah. I mean, as much as a 10-year-old can understand, I think she does." When the guardian was asked if "anyone had asked [Daughter] about her mother and how she feels about her rights—her relationship with her mother being severed forever," she responded: "A 10-year-old would have no concept if I tried to explain that to her" and that she did not know if Daughter understands that staying with her foster mother would mean that she will never be with her mother again. The guardian "[felt] like that's something that should probably be best addressed therapeutically."

The hearing adjourned with the district court instructing the Department to facilitate visits between Daughter and Uncle and to have Daughter's therapist at the next hearing. The district judge explained that "under these circumstances, I want to hear from the therapist" and that "if I'm going to make a decision, I want to have this kind of feedback." The therapist, however, did not testify at any point during the final hearing before the district court, although her December 2019 monthly report is in the clerk's record. According to the report, Daughter "asked if she could see her mother" and "[s]tated that she misses her" during her session on December 7, 2019.

In February 2020, the Department changed its plan for Daughter and sought to place her with Uncle, and in March 2020, the district court entered a temporary order placing her with Uncle. According to the therapist's report from the session with Daughter on December 21, 2019, the therapist stated that Daughter started to speak of memories of Uncle, that she was excited to see him, and that she thought it would be good to live with him. In the report from the session that occurred one week later, the therapist stated that Daughter told her

6

therapist that she "would like to live with [Uncle]." After both children were placed with Uncle, Mother agreed with the Department's plan for her children, executing an affidavit of relinquishment of her parental rights to her children in July 2020. The children, however, were removed from their placement with Uncle and Aunt in October 2020 based on allegations of physical abuse by Uncle. Daughter was returned to her foster mother who had cared for her from the beginning of the case, and Son was placed in a new foster home that could adopt him. During the pendency of the underlying case, Son was placed in several different foster homes.

The final hearing resumed April 27, 2021. At that point, the Department's plan was for Daughter's foster mother to adopt her and for a non-relative to adopt Son. The caseworker testified that Daughter had expressed her desire to stay with her foster mother and not have contact with her family and that Mother had not had contact with the children since before September 2019. Concerning Mother's compliance with her service plan, the caseworker testified that Mother did not participate in a psychological evaluation but that she had maintained contact with the Department, had her own apartment, was employed, was successfully discharged from individual therapy, and had tested negative on drug tests since December 2018 except "a couple of times that she didn't go in to test." Concerning the psychological evaluation, the caseworker explained that after the authorization expired, the Department did not re-authorize it.

When the hearing resumed on May 4, 2021, Daughter was twelve and Son was three. The witnesses were the caseworker, Mother, and the guardian ad litem. The evidence showed that the results of Mother's weekly drug tests were negative from August 2018, except a positive hair follicle test in December 2018 and a negative-diluted test result in March 2019. The caseworker acknowledged that Mother was not using drugs anymore and had been providing

negative drug tests for two years. The caseworker, however, testified that it was reported that on April 30, 2021, Daughter "had tried to commit suicide due to just not knowing where she fits in, or having concerns about being removed from the [foster] home" and that it was reported that Daughter feels safe in her current placement and does not want to go back with Mother. The caseworker expressed her opinion that the court should honor Daughter's wish to stay in her current placement. She also testified that she did not think that Mother would be protective because Mother did not believe the abuse allegations against Uncle.

Mother testified that she used methamphetamine at the beginning of the case, had used it "off and on" before that, and believed she was addicted at that time, but testified that she had "just quit" using drugs several years ago. Mother also testified that she had been employed for the past three-and-a-half years at a restaurant, that she had moved into her own two-bedroom apartment in November 2020, that she had the financial ability to take care of the children, that she had made three child support payments, and that she had a support system. Before moving into the apartment, she was living with her sister. Mother explained that she executed the affidavit of relinquishment only because she believed that the children would be placed with Uncle and that she would not have signed the relinquishment otherwise. As to the allegations of abuse by Uncle, although her testimony was not entirely clear, Mother testified that she "[was] not saying [she did not] believe that."

The guardian ad litem advised the court that Daughter consistently stated that she wanted to remain in her current placement with her foster mother and opined that it was in Daughter's best interest to stay in her current placement, explaining that Daughter "tried to kill herself when she thought that she might be going back with her mother" and that she "can't see how allowing that to happen could possibly be in the child's best interest." Concerning Son, the

8

guardian ad litem advised the court that she thought "it would be traumatic to [Son]" to place him with Mother because he did not know her. She referred to his removal from Mother at birth and the lack of visits with Mother since he was eight or nine months old.

Following the hearing, the district court signed the de-novo decree of termination, finding that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children and that it was in the children's best interest to terminate Mother's parental rights. *See* Tex. Fam. Code § 161.001(b)(1)(E), (2). This appeal followed.

## ANALYSIS

*Standard of Review*

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). The district court may order termination of the parent-child relationship if clear and convincing evidence supports that a parent engaged in one or more of the enumerated grounds for termination and that termination is in the best interest of the child. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *see A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). The clear and convincing evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"). "This heightened proof standard carries the weight and

9

gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630; *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases").

In appeals involving the termination of parental rights, legal sufficiency review of the evidence requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d at 630–31; *see In re J.F.C.*, 96 S.W.3d at 266. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

*Best Interest Finding*

Mother's issue does not challenge the district court's predicate-ground finding. She challenges the legal and factual sufficiency of the evidence to support the district court's best interest finding.

When deciding the best interest of a child, factors that we consider include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking

10

custody, the stability of the proposed placement, the parent's conduct which may indicate that the existing parent-child relationship is not a proper one, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). This list of factors is not exhaustive, not all of them need to be proven to determine a child's best interest, and analysis of a single factor may be adequate in a particular factual situation. *See In re C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 372.

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). "Moreover, termination is not warranted 'without the most solid and substantial reasons.'" *Id.* (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of her child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her child whatsoever." *Id.* (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

In its best interest determination, the district court reasonably could have credited the evidence that Mother had been addicted to and used methamphetamine in the past, when

pregnant with Son, and for several months after the children were removed from her care, including the evidence that she failed to submit to court-ordered drug tests. *See S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 Tex. App. LEXIS 5115, at *50 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.) (explaining that illegal drug use supports finding that termination is in child's best interest and that "factfinder may give great weight to this significant factor"); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A factfinder reasonably could infer that [parent's] failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs." (citing *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.))).

The district court also reasonably could have credited the caseworker's testimony that Daughter's expressed desire after she was removed from her placement with Uncle was not to have contact with her family and to live with her foster mother with whom she had a very close bond and had stayed with during the entirety of the underlying proceeding except when she was placed with Uncle. *See Holley*, 544 S.W.2d at 371–72 (listing child's wishes among factors to consider in best interest determination). The Department also presented evidence that the foster mother had taken the necessary steps to adopt Daughter and that Daughter felt safe and stable in her care. *Id.* (listing children's emotional and physical needs now and in future, parenting abilities of parties seeking custody, plans for children by parties seeking custody, and stability of proposed placement among factors to consider). As to Son, he was too young to express his wishes, but the Department presented evidence that he had been placed in a home that could adopt him and was taking care of his needs. The evidence further showed that after 2019, neither child had visited with Mother. Applying the applicable standard of review, we

12

conclude that the evidence was legally sufficient to support the district court's best interest finding. *See In re A.C.*, 560 S.W.3d at 630–31.

We, however, cannot reach the same conclusion as to the factual sufficiency of the evidence to support the district court's best interest finding. The alleged reason that the Department removed the children from Mother's care was her illegal drug use, and the evidence established that Mother had been drug-free for over two years when the final hearing concluded in May 2021. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) ("[T]he mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is currently in the child's best interest."); *see also In re R.L.*, No. 04-13-00226-CV, 2013 Tex. App. LEXIS 12279, at *17 (Tex. App.—San Antonio Oct. 2, 2013, no pet.) (mem. op.) (explaining that "[t]he best-interest inquiry is a forward-looking determination"). The evidence also showed that by the time that the final hearing concluded, Mother had been successfully discharged from individual therapy, completed her OSAR assessment in October 2018 with no recommended treatment, had been employed throughout the case with the same employer, had obtained an appropriate two-bedroom apartment for herself and her children, and maintained contact with the Department.

On appeal, the Department characterizes the evidence of negative drug tests for the past two years as "recent improvements" and argues that the district court could have reasonably formed a firm belief or conviction that "any recent improvements [Mother] has demonstrated are not likely to continue in the future" based on Mother's "'on and off' history of methamphetamine use." But Mother's improvements during the pendency of the case, including remaining drug-free for more than two years, are significant, consistent, and more than recent improvements. *See S.G. v. Texas Dep't of Family & Protective Servs.*, No. 03-21-00085-CV,

13

2021 Tex. App. LEXIS 6384, at *32–34 (Tex. App.—Austin Aug. 6, 2021, no pet. h.) (mem. op.) (considering evidence of parents' negative drug tests for over one year in best-interest analysis and concluding that evidence was factually insufficient to support best-interest finding).

When the final hearing concluded almost two years after it started, the Department did not present evidence that Mother was unable to care for her children or provide contrary evidence to the evidence that Mother's current home was appropriate, that she had stable employment, and that she presently was able to care and provide for her children. *See In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (explaining that to rebut "strong presumption that the best interest of a child is served by keeping the child with the natural parent," "there must be clear and convincing evidence of the natural parents' present unfitness"), *overruled in part on other grounds by In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, no pet.). As to the only task that Mother did not complete on her family service plan, the psychological evaluation, the Department did not reauthorize it after the district court reinstated the plan in April 2019.

Although the caseworker testified on the last day of the hearing in May 2021 that Daughter recently had attempted suicide, the Department did not present details about what happened. The foster mother was taking care of Daughter at that time, and the Department did not call her to testify. The testimony about the reason Daughter attempted suicide also was equivocal. The caseworker testified that it was "due to not knowing where she fits in, or having concerns about being removed from the home." The guardian ad litem represented that Daughter "tried to kill herself when she thought she might be going back with her mother," but she did not provide the underlying factual basis for this representation. Other than Mother's communication to Daughter about Father's death shortly after he died, the Department also did not present

14

evidence that Mother missed her weekly visits or that she acted inappropriately during her visits with her children prior to the visits being abated. After the visits were abated, Mother's visits required Daughter's therapist's approval, but the Department did not call the therapist as a witness despite the district court's request that it make her available or otherwise provide evidence of the therapist's reasons for continuing to deny visitation after the "confusion" over Father's death was resolved.[4] The caseworker also acknowledged that Mother, whose first language was not English, may have been confused by the Department's instruction to her not to discuss Father's death.

The Department also did not present evidence that would have established Daughter's maturity or her understanding that by staying with her foster mother, her relationship with her Mother would be severed forever. *See T.M.& O. v. TDFPS*, No. 03-21-00174-CV, 2021 Tex. App. LEXIS 8226 (Tex. App.—Austin Oct. 8, 2021, no pet. h.) (mem. op.) (observing that six-year-old expressed desire to be adopted by foster parent and seven-year-old expressed desire to be returned to mother's care but that there was "no evidence that children were mature enough to express such preferences or that their preferences should be given significant weight"); *In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) ("[A] child's preference should not be considered absent a showing of sufficient maturity."); *In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.) (concluding that "record contains scant

---

[4] The clerk's record contains an email dated May 2, 2019, from the therapist to the caseworker recommending that visits not resume between Mother and Daughter and stating her belief that resuming visits would be confusing to Daughter and that Daughter's "anxiety will take over" in the context "that the goal is not to return [Daughter] to [Mother] so [the therapist saw] no need to reopen wounds that are healing." The clerk's record also contains the December 2019 monthly report from the therapist in which she states that in one session, Daughter "asked if she could see her mother" and said that "she misses her" and, in another session, the therapist "[d]iscussed seeing and interaction with [Mother] if [Daughter] does go to live with [Uncle]," and Daughter "stated that she would like to live with [Uncle]."

15

evidence that any of the children possess sufficient maturity to express an opinion regarding a parental preference"). At the hearing in December 2019 when Daughter was ten, the guardian testified that "[a] 10-year-old would have no concept" if the guardian had tried to explain to her about forever severing a parent-child relationship and that she did not know if Daughter understood that staying with her foster mother would mean that she would never be with her mother again. The guardian "[felt] like that's something that should probably be best addressed therapeutically," but the Department did not call the therapist on any of the four days of trial.

Concerning Son, the Department changed its position over time. At the December 2019 hearing, it did not take a position on whether Mother's parental rights should be terminated if Son was placed with Uncle but, after the children were removed from Uncle's care, it sought to terminate Mother's parental rights and for a non-relative to adopt Son. The guardian ad litem represented to the district court that it would be "traumatic" for Son to be returned to Mother because he did not know her, but the evidence showed that he had been in multiple placements during the case and recently placed in a new home with people he did not know. Mother's home also would have allowed the children to live together, but the Department's plan was to place Son and Daughter separately. *See S.G.*, 2021 Tex. App. LEXIS 6384, at *33–34 (recognizing that it is generally in siblings' best interest to be kept together and reared as family where possible (citing *In re De La Pena*, 999 S.W.2d 521, 535 (Tex. App.—El Paso 1999, no pet.))).

In light of the entire record, we cannot conclude that the Department met its burden to present evidence that was factually sufficient to support a finding that termination of Mother's parental rights was in the best interest of the children. *See In re A.C.*, 560 S.W.3d at 631.

## CONCLUSION

For these reasons, we reverse the district court's decree of termination and remand the case to the district court for a new trial.

 

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith
  Dissenting Opinion by Justice Baker

Reversed and Remanded

Filed:  October 29, 2021